**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BRAHEIM BALLARD,** | : | **No. 15-180-9, 7, 16, 10, 12, 17** |
| **HASAN CHANEY,** | : | |
| **BRANDON SEGERS,** | : | |
| **WILLIAM JEFFERSON,** | : | |
| **JAMAL DOGGETT,** | : | |
| **SEI STONE** | : | |

**Goldberg, J.**                                                        **November 29, 2018**

## MEMORANDUM OPINION

This criminal matter involves a series of violent home invasions, robberies, kidnappings, and carjackings spanning several years, in which the victims were primarily drug dealers. In carrying out these crimes, Defendants and their co-coconspirators often used GPS tracking devices to locate a victim's home, where victims were often ambushed, beaten, and tortured, to ascertain the location of drugs and drug proceeds.

Defendants Braheim Ballard, Hasan Chaney, Brandon Segers, William Jefferson, Jamal Doggett, and Sei Stone, along with multiple other Defendants not at issue in this Opinion, were charged for these crimes in a multi-count indictment, which included one count of conspiracy and multiple counts of Hobbs Act robbery, kidnapping, carjacking, and brandishing a firearm while committing the other offenses.

Jefferson, Doggett, and Stone pled guilty, while Ballard, Chaney, and Segers proceeded to trial. On October 18, 2017, the jury convicted those three Defendants on certain counts, but acquitted or deadlocked on others.

Pending before me are several motions filed by all six Defendants referenced above. Ballard and Chaney have filed motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, challenging the sufficiency of the evidence, and seeking new trials based on both the weight of the evidence and alleged trial errors. Stone, Jefferson, and Doggett seek to withdraw their guilty pleas, in light of intervening case law that, they contend, invalidates their convictions for brandishing a firearm during a crime of violence. And all six Defendants seek relief based on contacts between a judicial law clerk previously assigned to this matter and the lead agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in this case.

For the reasons that follow, I will deny each of Defendants' Motions.

## I. **PROCEDURAL BACKGROUND**

On April 28, 2015, a federal grand jury returned a seventeen-count indictment charging Ballard, Chaney, Segers, Jefferson, and Doggett, as well as eleven others.[1] The grand jury subsequently returned a 30-count superseding indictment on May 26, 2016, adding Stone and three others.[2] Six of the Defendants, Marcus Bowens, Michael Queen, Daniel Hayes, Jeffrey Bellamy, Eric Scott, and Louis Miller, eventually entered into cooperation/plea agreements with the Government.

---

[1] The original indictment named the following Defendants: Khalil Smith, Mark Woods, Marcus Bowens, Michael Queen, Terrance Munden, Robert Hartley, Hasan Chaney, Levern Jackson, Braheim Ballard, William Jefferson, Daniel Hayes, Jamal Doggett, Jeffrey Bellamy, Romel Anthony, Eric Scott, and Brandon Segers.

[2] The Superseding Indictment added the following Defendants: Sei Stone, Edwin Robinson, Louis Miller, and James Haines.

Both the original and superseding indictment charged a conspiracy "[f]rom in or around September 2012 through on or about April 29, 2014," in violation of the Hobbs Act, 18 U.S.C. § 1951(a). The superseding indictment described eleven incidents as part of the conspiracy, as well as one independent incident, amounting to twelve total incidents.

Given the large number of Defendants, and courtroom management and safety concerns, one trial with all Defendants was not feasible. Consequently, by Order of the Chief Judge of this Court, the case was split into three trial phases. "Phase I," over which I presided, began on January 31, 2017, and included: Khalil Smith, Mark Woods, Terrance Munden, Robert Hartley, and Levern Jackson. This trial lasted eleven weeks and resulted in guilty verdicts against each of these Defendants.

The Defendants at issue in this Opinion—Ballard, Chaney, Segers, Jefferson, Doggett, and Stone—along with one other Defendant, Edwin Robinson, were set to proceed to trial in "Phase II" of this case, before another judge on this court ("the Phase II Judge"). Before that trial began on September 6, 2017, Jefferson, Doggett, and Stone pled guilty.[3] Chaney, Ballard, Segers, and Robinson proceeded to trial and, on October 18, 2017, a jury returned a verdict, convicting Ballard, Chaney and Segers on one count each, but acquitting or deadlocking on the other counts.[4]

---

[3] Specifically, Jefferson pled guilty to Counts One, Two, Three, Four, and Six; Doggett pled guilty to Counts One, Fifteen, Sixteen, and Seventeen; and Stone pled guilty to Counts One, Eighteen, and Nineteen.

[4] Specifically, Ballard was found guilty on Count Fifteen, not guilty on Counts One and Sixteen, and the jury deadlocked on Count Seventeen. Chaney was found guilty on Count Twenty-Two, not guilty on Counts Eleven and Twenty-Five, and the jury deadlocked on Counts One, Ten, Twelve, Thirteen, Fourteen, Twenty-Three, Twenty-Four, and Twenty-Six. Segers was found guilty on Count Eight, not guilty on Count One, and the jury deadlocked on Count Nine. The Government declined to retry these Defendants on the counts on which the jury was deadlocked.

Robinson—who is not at issue in this Opinion—was found not guilty on Count One, and the jury deadlocked on Counts Eighteen and Nineteen. The Government opted to retry Robinson. He was scheduled to be retried in the spring of 2018 before me, but pled guilty prior to the retrial.

In April 2018, Ballard and Chaney filed post-verdict motions under Federal Rules of Criminal Procedure 29 and 33. On May 23, 2018, Ballard's and Chaney's motions were reassigned from the Phase II Judge to me by Order of the Chief Judge of this Court, following the disclosure of contacts between the Phase II Judge's law clerk assigned to this matter and the ATF agent who oversaw the investigation of the entire case (discussed in greater detail in Part V, below). Thereafter, all six Defendants at issue here—Ballard, Chaney, Segers, Doggett, Stone, and Jefferson—filed motions seeking relief based on those contacts. Additionally, three of these Defendants—Stone, Jefferson, and Doggett—have filed motions seeking to withdraw their guilty pleas based on the Supreme Court's recent decision, <u>Sessions v. Dimaya</u>, 138 S. Ct. 1204 (2018), which, they contend, invalidates their convictions for brandishing a firearm during a crime of violence under 18 U.S.C. § 924(c).

All of these motions are now ripe for decision and, for the reasons discussed below, will be denied.

## II. <u>FACTUAL BACKGROUND</u>

Only the details of two of the incidents charged in the superseding indictment are relevant to the issues addressed in this Opinion:

- An armed home invasion attempted robbery on November 7, 2013 (Counts Fifteen, Sixteen, and Seventeen) ("Leas Way"); and

- An armed kidnapping on March 19, 2014 (Counts Twenty-Two and Twenty-Three) ("Mayfair Street").[5]

Phase III of this case consisted of one Defendant, Romel Anthony, who proceeded to trial before me on June 4, 2018. On June 11, 2018, he was found guilty on Count Four and not guilty on Count Five.

[5] The other ten incidents, described in detail in the Court's July 18, 2018, Memorandum Opinion, are as follows: (1) an armed home invasion robbery on September 3, 2012 (Counts Two and Three) ("Railroad Avenue"); (2) an attempted possession with intent to distribute cocaine on September 11, 2012 (Counts Four and Five) ("Bristol Street"); (3) an attempted armed robbery on October 9, 2012 (Counts Six and Seven) ("Cherry Hill"); (4) an attempted armed robbery on July 15, 2013 (Counts Eight and Nine) ("Platinum Jewelers"); (5) a kidnapping, carjacking, and armed home invasion robbery (Counts

### A. Leas Way (Counts Fifteen, Sixteen, and Seventeen)

Cooperating witnesses Bowens and Queen testified that on November 7, 2013, Smith, Bowens, Queen, Ballard, and Doggett met in the parking lot of the Cheltenham Mall and drove to Hatfield, Pennsylvania, in order to rob a drug dealer named M.M., whom they had been monitoring using a GPS tracker. Bowens and Queen explained that Doggett served as lookout and informed the others, who were lying in wait, when M.M. was approaching his home. Smith, Bowens, Queen, and Ballard ambushed M.M. as he pulled into his driveway. They then took M.M.'s car keys and subdued him before bringing him into his home. After restraining and assaulting M.M., Ballard stood watch over him, while the other men ransacked the house, taking electronics, firearms, and personal items. The men packed the stolen items into M.M.'s BMW, which Bowens drove off. Bowens abandoned the BMW on the highway when it ran out of gas, but not before taking a backpack containing a laptop computer, cellphones, and money from the vehicle.

### B. Mayfair Street (Counts Twenty-Two and Twenty-Three)

Bowens testified that, on March 19, 2014, he, Smith, Woods, Munden, Hartley, Chaney, Jackson, and Bellamy met near victim O.T.'s home on Mayfair Street in Philadelphia with plans to rob and kidnap O.T. Woods and Chaney waited in a parked van near O.T.'s house while the others waited nearby for O.T. When they observed O.T. arrive, Smith, Munden, Hartley, Chaney, and Bowens rushed and subdued O.T. Bellamy and Jackson served as lookouts, and Woods drove

---

Ten, Eleven, Twelve, Thirteen, and Fourteen) ("Master Street"); (6) an armed home invasion robbery on December 28, 2013 (Counts Eighteen and Nineteen) ("Lansford Street"); (7) an armed home invasion robbery on January 27, 2014 (Counts Twenty and Twenty-One) ("Pulaski Avenue"); (8) an armed home invasion attempted robbery and carjacking on April 16, 2014 (Counts Twenty-Four, Twenty-Five, and Twenty-Six) ("Regent Street"); (9) an armed home invasion robbery on April 24, 2014 (Counts Twenty-Seven and Twenty-Eight) ("Ridge Avenue"); and (10) an armed home invasion attempted robbery on April 29, 2014 (Counts Twenty-Nine and Thirty) ("Wyndale Avenue").

the van. Video footage showed five men attacking O.T. Bowens identified these five men as Smith, Munden, Hartley, Chaney, and Bowens.

Bowens testified that he, Smith, Munden, Hartley, and Chaney assaulted and subdued O.T. before throwing him into Woods's van. O.T. was transported to Hartley's van and eventually Munden's garage, while being continuously assaulted. Bowens and Bellamy remained outside of Munden's home, while Smith, Woods, Chaney, Hartley, and Munden took O.T. inside the garage. Jackson remained behind at O.T.'s house to monitor for police activity.

In Munden's garage, the men violently beat and tortured O.T., demanding to know where O.T. kept his drugs and drug proceeds. O.T. was then forced to call his sister to arrange for a ransom payment of $50,000. Once the ransom money was collected, O.T. was released.

## III.   **BALLARD'S AND CHANEY'S RULE 29 AND RULE 33 MOTIONS**

Both Ballard and Chaney were convicted of a single count: Ballard of Count Fifteen, for the attempted Hobbs Act robbery at Leas Way, and Chaney of Count Twenty-Two, for the kidnapping at Mayfair Street. Both challenge the sufficiency of the evidence under Rule 29, and seek new trials under Rule 33, based on the weight of the evidence and alleged errors at trial. After a thorough review of the trial record, I conclude that Ballard's and Chaney's motions are without merit.

### A.  *Legal Standard Under Rules 29 and 33*

Federal Rule of Criminal Procedure 29(c) permits a defendant to "move for a judgment of acquittal." Such a motion requires the court to "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making this

determination, the court must "draw all reasonable inferences in favor of the jury verdict." United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996). "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005). A defendant bears an "extremely high" burden under Rule 29 when challenging the sufficiency of the evidence supporting a jury verdict. United States v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008) (quoting United States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005)). "Thus, a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

While a motion for judgment of acquittal is governed by Rule 29, a motion for a new trial is analyzed under Rule 33, which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Motions under Rule 33 may be based on the weight of the evidence, or on alleged errors at trial. However, "[m]otions for a new trial based on the weight of the evidence are not favored. . . . Such motions are to be granted sparingly and only in exceptional cases." Gov't of the V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987) (citing United States v. Martinez, 763 F.2d 1297, 1313 (11th Cir. 1985)). After independently weighing the evidence, a new trial may be ordered only if "the verdict was contrary to the weight of the evidence" and "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008). "Although the court exercises its own judgment in a Rule 33 motion, including the right to weigh the evidence and determine credibility, the court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be

more reasonable." United States v. King, No. 09-cr-211, 2010 WL 1539886, at *24 (E.D. Pa. Apr. 14, 2010) (internal quotation marks omitted).

Rule 33 also permits a court to grant a new trial where "errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." United States v. Rich, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (citing United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994)); see also United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (holding that a new trial is required on the basis of errors "only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial" (alterations and internal quotation marks omitted)). Accordingly, a court considering whether a new trial is appropriate on the basis of alleged errors should first determine whether the defendant has correctly identified any errors during the trial, and, if so, undertake a harmless error analysis to determine whether those errors merit a new trial. This analysis requires consideration of the entire record, and the standard applied depends upon the nature of the error. If the error does not rise to the level of a constitutional violation, the conviction may stand so long as it is "highly probable" that the error "did not contribute to the jury's judgment of conviction." United States v. Jannotti, 729 F.2d 213, 219 (3d Cir. 1984) (quoting Gov't of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976)). If, however, constitutional violations have occurred, a new trial is warranted unless the violations are harmless beyond a reasonable doubt. United States v. Molina–Guevara, 96 F.3d 698, 703 (3d Cir. 1996).

As noted above, the Phase II trial was presided over by another judge, but these post-verdict motions were reassigned to me by Order of the Chief Judge on May 23, 2018. Before addressing the substance of Defendants' motions, I note that both Ballard and Chaney have suggested that I cannot decide their post-verdict motions, because they are, Defendants claim, in large part based

on the credibility of witnesses who testified at trial. However, Federal Rule of Criminal Procedure 25(b)(1) provides that a judge who did not preside at trial may "complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability." Courts have held that recusal of the trial judge is a valid reason for a second judge to review and rule upon the motions at issue. See, e.g., United States v. Colon-Munoz, 318 F.3d 348, 355 (1st Cir. 2003). And while Rule 25(b)(2)(A) permits a successor judge to grant a new trial "if a judge other than the one who presided at trial cannot perform the post-trial duties," a new trial is not required merely because the post-verdict motions call for an assessment of credibility, because a successor judge is "capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record." United States v. Bourgeois, 950 F.2d 980, 988 (5th Cir. 1992).

### B. *Ballard's Challenge to the Sufficiency and Weight of the Evidence*

Ballard seeks a judgment of acquittal or a new trial for the single count of conviction: Count Fifteen, the attempted Hobbs Act robbery at Leas Way. In advancing this argument under Rule 29, Ballard contends that Queen's and Bowens' testimony regarding the incident "deviated on several important material points," and as a result "no rational jury, who followed the Court's instructions to scrutinize [their] testimony with great care and caution, could have found Mr. Ballard guilty." (Ballard Mot., Doc. No. 1306, at 2.) Additionally, Ballard contends that these "numerous inconsistencies and contradictions" require a new trial under Rule 33. (Id. at 5.) However, a review of the testimony to which Ballard points reveals that it is inconsistent only regarding minor details about which it would be unsurprising that two witnesses would have different recollections. Moreover, as to much more significant details, Queen's and Bowens' testimony was both consistent and corroborated by other substantial evidence.

Ballard points to six alleged inconsistencies—five between the testimony of Queen and Bowens, and one between Queen's testimony at trial and his statement during a proffer session with the Government. The six alleged inconsistencies concern: (1) who provided the GPS tracker that was placed on M.M.'s vehicle, (2) who put the tracker on M.M.'s vehicle; (3) who monitored the tracker; (4) who conveyed the information gleaned from the tracker to the others in the crew; (5) who followed whom on the trip between the Cheltenham Mall and M.M.'s house on Leas Way; and (6) where Ballard obtained a Gatorade bottle from which he drank during the home invasion.

As to his first point, Ballard focuses on Queen's and Bowens' testimony regarding who provided the GPS tracker that was placed on M.M's vehicle. Queen testified that the tracker "came from [Doggett and Ballard]." (N.T. 9/18/17 at 141:16-19.) Bowens testified that he "th[ought]" that Woods provided the tracker. (N.T. 9/27/17 at 74:11-20.) While this testimony is inconsistent, who actually provided the tracker is not a significant detail. And the jury may have chosen to credit Queen, Bowens, or neither on this point and still could have easily reached a guilty verdict.

Second, Ballard points to Queen's and Bowens' testimony regarding who put the tracker on M.M.'s vehicle. Queen testified that he and Smith put the tracker on the vehicle. (N.T. 9/18/17 at 141:8-15.) Bowens testified that he "c[ould not] remember" who was responsible for placing the tracker on the vehicle. (N.T. 9/26/17 at 46:10-17.) This testimony is not inconsistent, as Bowens simply did not remember. And even if the testimony was inconsistent, who put the tracker on the vehicle—much like who provided the tracker—is not a critical detail.

Third, Ballard cites Queen's and Bowens' testimony regarding who monitored the tracker in order to learn where M.M. lived and when he would be home. Queen testified that, after he and Smith put the tracker on M.M.'s vehicle, Ballard and Doggett "w[ere] basically tracking [M.M.]." (N.T. 9/18/17 at 141:8-15.) When asked whether anyone else "w[as] involved in tracking the

victim," Queen responded that he "want[ed] to say [Bellamy]." (N.T. 9/18/17 at 144:4-6.) Bowens, on the other hand, testified that Woods was responsible for monitoring the tracker, but later in his testimony noted that he "forgot who was doing the tracker." (N.T. 9/26/17 at 46:25-47:5, 51:5-8.) Again, while testimony about who monitored the tracker was not entirely consistent, this is a minor detail, as to which both Queen and Bowens seemed less than entirely certain. The jury may have credited neither witness on that specific point and still have believed the remainder of their testimony.

Fourth, Ballard points to Queen's and Bowens' testimony regarding who conveyed the information about M.M. gleaned from the tracker. Queen testified that Ballard "had come to the block and . . . basically told [Smith]" this information, and that Queen overheard that conversation. (N.T. 9/18/17 at 146:4-14.) Bowens testified that the crew learned the information "through Smith." (N.T. 9/26/17 at 50:10-25.) This testimony is not inconsistent, as both testified that Smith was the conduit for the information.

Fifth, Ballard points to Queen's and Bowens' testimony regarding who followed whom on the trip from the Cheltenham Mall to M.M.'s house on Leas Way. Queen testified that he, Smith, and Bowens, travelling in Smith's car, followed Ballard and Doggett, who were travelling in a van. (N.T. 9/18/17 at 150:17-151:17; N.T. 9/19/17 at 73:2-23.) Bowens, however, testified that it was the other way around: that Ballard and Doggett followed him, Queen, and Smith. (N.T. 9/27/17 at 204:9-13, 237:2-22.) While this testimony is inconsistent, this is a very minor detail as to which the jury could credit either witness and still conclude that Ballard was guilty.

Sixth and finally, Ballard points to Queen's testimony on cross-examination regarding whether a Gatorade bottle, from which Ballard drank during the robbery, came from a refrigerator in M.M.'s garage, contending that this testimony was inconsistent with what he previously told

the Government during a proffer session. During cross-examination, Ballard's counsel asked Queen about this bottle:

> Q. . . . Do you remember telling the Government that the bottle came from a refrigerator?
>
> A. No.
>
> Q. Do you remember telling the Government that the bottle came from a refrigerator which was located in the garage?
>
> A. I remember seeing the Gatorade – the Gatorade bottles in the garage, but I don't know exactly where [Ballard] got his from.
>
> Q. So the answer to my question is that no, you did not tell them that Mr. Ballard got the Gatorade bottle from a refrigerator located in the garage.
>
> A. I did not see where he got it from, so no.

(N.T. 9/19/17 at 86:22-87:10.)

Ballard points out that the Report of Investigation prepared by the Government agents, summarizing one of Queen's proffer sessions, noted that Queen "stated that Ballard drank from a previously unopened Gatorade from the victim's refrigerator in the garage." (N.T. 10/2/17 at 215:20-216:4.) While Queen's testimony deviates on this point from what the agent recorded him saying during the proffer session, the point is a very minor one. Queen clarified at trial that while he saw Ballard drink from an unopened Gatorade bottle during the robbery at Leas Way, and while he saw Gatorade bottles in M.M.'s garage, he did not see Ballard obtain the bottle. The jury could easily have believed this testimony.

In sum, the six details as to which Ballard claims Bowens and Queen were inconsistent are minor—and only the testimony as to four of those details can even be considered inconsistent. The jury could reasonably and easily have resolved these four inconsistencies one way or another, while still crediting the remainder of the testimony, which was consistent on other much more

important details. See, e.g., United States v. Salahuddin, 765 F.3d 329, 346 (3d Cir. 2014) (affirming district court's denial of the defendant's Rule 33 motion challenging the credibility of one of the Government's witnesses, and noting that "many of the[] claimed inconsistencies [were] minor or more ambiguous than [the defendant] ma[de] them out to be," and that "[e]ven if the inconsistencies were more glaring than they appear to be, [a] jury is free to believe part of a witness' testimony and disbelieve another part of it" (internal quotation marks omitted)); United States v. Boone, 279 F.3d 163, 189 (3d Cir. 2002) (affirming district court's denial of the defendant's Rule 29 motion based on alleged inconsistencies in a Government witness's testimony and noting that the jury "could easily have credited [the witness's] direct testimony . . . notwithstanding any purported inconsistency").

Importantly, Queen and Bowens were entirely consistent regarding which individuals were involved in the robbery, including Ballard. Queen and Bowens consistently described the Defendants' respective roles, what route that they took to get to M.M.'s house, and how they ambushed M.M, took him into the house, searched for money and drugs, and loaded stolen items into M.M.'s vehicle, which Bowens drove off. (Compare N.T. 9/18/17 at 136:15-18, 150:17-20, 155:21-25, 160:25-161:5, 164:2-170:5, with N.T. 9/26/17 at 48:14-17, 49:4-50:9; 52:5-11, 54:6-14, 56:24-61:25.)

Moreover, Queen's and Bowens' testimony was corroborated by other compelling evidence of Ballard's guilt. The Government introduced cell site location records for a cell phone linked to Ballard. This evidence placed Ballard within half of a mile of M.M.'s home on Leas Way around the time of the robbery, as well in the days before the robbery. (N.T. 9/28/17 at 61:16-69:12.) The Government also introduced records of incoming and outgoing telephone calls for Ballard's phone on the day of the robbery, which revealed six calls between Ballard's phone and

Smith's phone, and 14 calls between Ballard's phone and Doggett's phone. (N.T. 10/3/17 at 106:2-108:13.)

The jury's verdict convicting Ballard on Count Fifteen, for the attempted Hobbs Act robbery at Leas Way, is unsurprising in light of the strong evidence presented by the Government. This evidence included both Queen's and Bowens' testimony, and corroborating cell site information and phone records. Accordingly, Ballard's motion seeking a judgment of acquittal based on the sufficiency of the evidence, or a new trial based on the weight of the evidence, will be denied.

### C. Chaney's Challenge to the Sufficiency and Weight of the Evidence

Chaney also seeks a judgment of acquittal or a new trial for the single count on which he was convicted: Count Twenty-Two, the kidnapping at Mayfair Street. And like Ballard's motion, Chaney's motion under Rule 29 and Rule 33 is premised, in part, on his contention that the testimony of the cooperating witness, Bowens, was not credible in light of certain inconsistencies. Chaney points out that Bowens' testimony during the Phase II trial was inconsistent with his testimony in the Phase I trial, and with the testimony of another cooperating witness, Jeffery Bellamy, who testified about the Mayfair Street kidnapping, also in the Phase I trial.

Specifically, Chaney points to three aspects of Bowens' testimony regarding the Mayfair Street kidnapping: (1) where the victim, O.T., was parked at the time of the ambush; (2) who was wearing a police badge during the kidnapping; and (3) who was the first to get to O.T. after he fell down. Much like the inconsistencies alleged in Ballard's motion, these are minor details, which even if actually inconsistent do not undermine the overall credibility of Bowens' testimony, which was also corroborated by other evidence.

First, Chaney points to Bowens' testimony regarding where O.T. parked just before he was ambushed. At the Phase II trial, Bowens testified that O.T. "parked in his regular spot" in front of his house. (N.T. 9/26/17 at 148:23-149:5.) However, in the Phase I trial, Bowens testified that Woods' van—into which O.T. was ultimately thrown during the kidnapping—had "parked in [O.T.'s] parking spot . . . in front of [O.T.'s] door." (N.T. 3/21/17 A.M. at 80:14-22.) Bowens explained during the Phase I trial that the crew forced O.T. to park in a different spot, farther from his house than usual, in order to make it easier to ambush him before he could get to his house. (N.T. 3/21/17 A.M. at 80:23-81:15.) While the testimony on this fact is not entirely consistent, where O.T. parked is a minor detail. Whether or not the jury credited Bowens' testimony that O.T. parked in his regular spot, the jury could still easily have credited Bowens' testimony about Chaney's involvement in the Mayfair Street crime.

Second, Chaney points to Bowens' testimony regarding who was wearing a police badge during the kidnapping. Bowens testified, during both the Phase I and Phase II trials, that Chaney was wearing a police badge. (N.T. 3/21/17 at 89:17-24; N.T. 9/26/17 at 152:9-16.) Bowens also testified during the Phase I trial that "everybody else . . . was pretty much like – looking like civilians." (N.T. 3/21/17 at 89:25-90:3.) However, Bellamy testified during the Phase I trial that Munden, Smith, and Bowens wore police badges, and did not testify that Chaney wore such a badge. (N.T. 3/8/17 at 211:2-13.) While Bowens' and Bellamy's testimony—at least in the Phase I trial—were not entirely consistent on this point, this again is a minor point. A jury could have reasonably concluded that either Bowens or Bellamy was mistaken on this point. What was consistent was Bowens' testimony that Chaney participated in the kidnapping.

Third, Chaney points to testimony regarding which of the five men who ambushed O.T. "were the first to get to [him] after he fell down in the street." (Chaney Mot., Doc. No. 1331, at 8.) On direct examination in the Phase I trial, Bowens was shown a video of five men ambushing O.T., and was asked to identify "the two people that were immediately on the victim," after the victim had fallen down. Bowens replied "[t]he closest would be Mr. Hartley and [Munden]." (N.T. 3/21/17 at 88:10-23.) Chaney argues that this testimony is contradicted by Bellamy's testimony in Phase I, that Munden, Smith, and Bowens "tackled" O.T. (N.T. 3/8/17 at 210.) These are not entirely inconsistent, as Bellamy did not testify as to who was "closest" to O.T. or the "first to get to him" when he went down. And even if Bowens' and Bellamy's testimony were inconsistent on this point, it is inconsequential.

These minor inconsistencies, either viewed separately or together, do not undermine Bowens' testimony about the Mayfair Street kidnapping, particularly Chaney's involvement. The Government presented consistent testimony throughout both the Phase I and Phase II trials. In both, Bowens testified that Chaney rode to O.T.'s house with Woods in a van; that Chaney—along with Bowens, Smith, Hartley, and Munden—ambushed O.T.; and that Chaney rode in the van into which O.T. was thrown, as the men left the scene. (Compare N.T. 3/21/17 at 78:1-4, 79:8-9, 91:2-4, with N.T. 9/26/17 at 147:13-15, 151:22-24, 154:8-11.)

Moreover, the testimony about Chaney's involvement was corroborated by other substantial evidence. Specifically, the Government introduced call records for Chaney's cell phone from the evening and early morning hours during which the kidnapping took place. These records showed two calls between Chaney's phone and Smith's phone, three calls between Chaney's phone and Munden's phone, and five calls between Chaney's phone and Hartley's phone. (N.T. 10/3/17 at 112:3-117:19.) In light of the minor nature of the inconsistencies in Bowens' testimony,

and the significant corroborating evidence of guilt, Chaney's motion seeking a judgment of acquittal or a new trial based on the sufficiency or weight of the evidence will be denied.

### D. Ballard's Challenge to the Production of Inculpatory Records During Trial

In addition to challenging the sufficiency and weight of the evidence, Ballard requests a new trial because, three weeks into trial, the Government produced "veterinary and employment records connecting someone named 'Braheim Ballard' to the phone number which had registered off of a cell phone tower at or near the time of the [Leas Way] robbery." (Ballard Mot., Doc. No. 1306, at 10.) For the reasons set out below, this argument also fails.

Ballard does not contend that the Government possessed these records long before they were produced to his counsel. Indeed, as Ballard apparently concedes, the Government produced the records one day after the Government obtained them. Ballard, however, contends that the Government's failure to search for these records earlier caused significant prejudice. Specifically, he notes that "[f]rom the first day of trial, [his] defense strategy was to distance [himself] from that specific cell phone number," and that this strategy would have been different had the Government found and produced the records at issue before trial.[6] (Ballard Mot., Doc. No. 1306, at 10.) Accordingly, Ballard argues that "fundamental fairness" and "the interests of justice" require a new trial. (Id.)

The Government is not prohibited from searching for evidence while the trial is proceeding, so long as the Government complies with the requirements of Federal Rule of Criminal Procedure 16(c) and the Due Process Clause. Rule 16(c) requires "a party who discovers additional evidence or material before or during trial [to] promptly disclose its existence to the other party or the court."

---

[6] As Ballard further notes, the Phase II Judge set a deadline of June 26, 2017—approximately two months before the Phase II trial commenced—for the completion of discovery. (See 2d Am. Scheduling Or., Doc. No. 907, ¶ 5.)

Here, Ballard does not dispute that the Government discovered the evidence during trial and promptly disclosed it. Accordingly, the requirements of Rule 16 were met.

The Government's ability to search for additional evidence for use at trial is also limited by the Due Process Clause, as the right to a fair trial is implicated whenever the late disclosure of inculpatory evidence denies a defendant "adequate time to attempt to overcome the prejudicial effect of such evidence." United States v. Espericueta-Reyes, 631 F.2d 616, 623 (9th Cir. 1980); see also United States v. Anderson, 509 F.2d 312, 323 (D.C. Cir. 1974) (noting that "a reasonable time for adequate preparation of the accused's defense is the first essential of trial fairness"). However, "[i]n such a case, it is the responsibility of defense counsel to bring the matter of potential prejudice to the attention of the court . . . and either request a continuance or move the court for a ruling excluding the objectionable [evidence] on due process grounds," as "[s]uch a procedure . . . allow[s] the trial court to make an informed decision as to how best to deal with any prejudice the defendant might otherwise suffer." Espericueta-Reyes, 631 F.2d at 623.

Here, Ballard does not contend that he requested exclusion of the records at issue at the time they were produced, or even a continuance in order to inquire into the veracity of the records or otherwise prepare a defense to them. Thus, the Phase II Judge had no opportunity at trial to address whether a continuance would be sufficient to address any prejudice caused by the late production. Accordingly, the record does not support Ballard's claim that he was denied the right to adequately prepare a defense, and therefore his motion on this basis will be denied.

### E. Chaney's Contention That He Was Improperly Restricted from Cross-Examining Cooperating Witnesses

Like Ballard, Chaney also seeks a new trial under Rule 33, based on alleged errors at trial. Chaney first contends that he was improperly "restricted in using . . . prior statements" and "undisputed evidence of . . . violent uncharged act[s]" in cross-examining three cooperating

witnesses who testified on behalf of the Government at trial: Daniel Hayes, Michael Queen, and Charles Wardlaw. (Chaney Mot., Doc. No. 1331, at 9.) But Chaney identifies no specific examples of rulings limiting his use of such prior statements and other evidence, and explains only that he "had proper reasons for using . . . [Hayes'] and Queen's [proffer statements, as recorded in the Government's Reports of Investigation] and [a] video of . . . Wardlaw involved in a shooting to impeach the witnesses." (Id. at 10.) For the reasons discussed below, a new trial is not warranted on this basis.

First, Chaney does not explain how these purported errors prejudiced him. Chaney was convicted only on Count Twenty-Two, the Mayfair Street kidnapping. Yet two of the three witnesses at issue, Hayes and Wardlaw, appear to have offered no testimony at all regarding that particular kidnapping, as neither of them was involved in that incident.[7] And the other witness at issue, Queen, only testified regarding the Mayfair Street incident that Smith had told him, during a jail visit, that the crew had "grabbed this guy," that "they had got about 50 or 60 grand from him," and that Chaney "had basically fucked the guy up." (N.T. 9/18/17 at 226:23-229:25.) But even if this testimony was material to Chaney's guilt as to the Mayfair Street kidnapping, a review of the evidentiary rulings Chaney vaguely complains of reveals no error.

During his cross-examination of Hayes, Chaney's counsel asked about "other robberies that [Hayes] . . . told the agents about," particularly ones that Hayes "didn't get charged with" and which were not charged in the indictment. (N.T. 9/13/17 at 187:18-22.) After the Government objected, Chaney's counsel explained that the incidents were relevant to Hayes' bias—specifically, because they showed that Hayes received a benefit from the Government by not being charged with those robberies. (Id. at 193:19-194:8.) Chaney's counsel noted that he possessed the Report

---

[7] Wardlaw was involved in the Master Street incident, in which Chaney was charged but not convicted.

of Investigation for Hayes' proffer session with the Government and that he intended "to go through the statements [Hayes] gave to the agents" about these uncharged robberies. (Id. at 188:17-189:9.) The Government responded that this would require it to call its agents to explain why Hayes was not charged with each of these robberies. (Id. at 194:9-196:6.)

In sustaining the Government's objection, the Phase II Judge concluded that Chaney's counsel could not ask Hayes about the *details* of these uncharged robberies, but could ask *generally* whether Hayes committed other robberies for which he was not charged. (N.T. 9/13/17 at 201:2-17.) Citing Federal Rule of Evidence 403, the Phase II Judge determined that this ruling struck the appropriate balance between the probative value of these robberies for bias, and the risk that a detailed discussion would result in a confusion of the issues, mislead the jury, and waste time. (Id. at 202:10-203:10.) See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, . . . [or] wasting time . . . ."). This was an appropriate application of Rule 403—as the probative value of the uncharged robberies for bias could be obtained through general questioning about these robberies, while the discussion of the details of such robberies would very likely confuse and mislead the jury, which was already required, over a six-week trial, to absorb the details of the many *charged* robberies, kidnappings, and carjackings.

Likewise, during his cross-examination of Queen, Chaney's counsel asked about a robbery that Queen had been involved in but that had not been charged in the indictment. (N.T. 9/18/17 at 242:10-12.) The Government again objected, citing the Phase II Judge's previous ruling as to Hayes, which prohibited Chaney's counsel from inquiring into specific details about uncharged robberies. (Id. at 242:23-5.) Again relying on Rule 403, the Court permitted Chaney's counsel to ask generally about Queen's involvement in other uncharged robberies, without getting into

specific details about those robberies. (Id. at 249:17-250:2.) For the same reasons discussed above, this was an appropriate application of Rule 403.

Finally, during his cross-examination of Wardlaw, Chaney's counsel sought to introduce a video of a robbery in which another cooperating witness, Louis Miller, was involved, but not charged with. (N.T. 9/14/17 at 3:9-5:7). Chaney's counsel argued that the purpose of showing the video was to demonstrate that Miller was "more violent than he may otherwise want to portray." (Id. at 3:19-4:9.) The Government objected, arguing that the video, like the testimony sought from Hayes and Queen, concerned details of an uncharged robbery and should thus be excluded. The Phase II Judge excluded the video, holding that it fell squarely within the prohibition on impeachment by extrinsic evidence contained in Federal Rule of Evidence 608. (Id. at 5:18-6:4.) See Fed. R. Evid. 608(b) ("[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.") Chaney offers no reason why this decision was in error, and I can discern none, given that Chaney's counsel's proffered explanation for the relevance of the video—which was indisputably extrinsic evidence—was to impeach Miller's character for truthfulness.

In sum, Chaney has not shown any evidentiary error during the cross-examination of Queen, Hayes, and Wardlaw. Nor has he shown how such rulings contributed to the jury's guilty verdict on the sole charge for which he was convicted.

### F. Chaney's Argument Regarding a Post-Verdict Note from a Juror

Next, Chaney contends that the jury's guilty verdict "should be nullified" because "[a]t the conclusion of the trial, and after the verdict was recorded, a juror notified the Court that they had not fulfilled their oath, specifically as to the verdict on Count Twenty-[T]wo." (Chaney Mot., Doc. 1331, at 10.) Chaney's argument refers to an email that one of the jurors sent to the Phase II Judge's

deputy clerk on October 19, 2017, one day after the jury rendered its verdict. The email noted that the juror "d[id] not agree with the guilty verdict that was rendered for Hasan Chaney's kidnapping charge." The juror's email explained that, during the deliberations, "there were several instances where [the juror's] fellow jurors took hard stands and dug in on a decision, even when there may not have been enough evidence . . . to support the decision." The juror noted that he or she ultimately "succumbed to the pack mentality and cast a vote for guilty."

After receiving this note, the Phase II Judge disclosed it to counsel and convened a hearing on October 30, 2017, to hear argument as to what relief, if any, was warranted. At the hearing, Chaney's counsel did not request that the juror be recalled for an evidentiary hearing, conceding that "both the rules and the case law are pretty clear that that is not permissible other than [in] some slight circumstances." (N.T. 10/30/17 at 3:4-9.) However, Chaney's counsel did request the opportunity to raise and brief the issue in a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. (<u>Id.</u> at 12:18-23.)

Chaney has raised this pursuant to Rule 33 and contends that the email "suggests that there was improper conduct by the jury as a whole in regards to the verdict." (Chaney Mot., Doc. 1331, at 10.) Chaney therefore "requests that the juror be recalled so a record may be made to determine whether the juror or other members of the jury violated their oath." (<u>Id.</u>)

In its Response, the Government points out that the juror "did not allege any extraneous communication at all, or . . . [that] any outside influence was improperly brought to bear upon any juror, or [that] there was a mistake in entering the verdict onto the verdict form." (Gov't Resp., Doc. No. 1514, at 31.) Rather, the Government notes, "[t]he juror's statement solely addressed supposed thought processes of the jurors, suggesting that some had voted to convict despite misgivings." (<u>Id.</u>) The Government argues that such matters "fall[] squarely within the realm of

deliberations into which judicial inquiry is forbidden," under the Federal Rules of Evidence. (Id.)

I agree with the Government, that neither recalling the juror, nor any other relief, is appropriate.

Federal Rule of Evidence 606(b)(1) provides:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Rule 606(b)(2) sets out three exceptions to the general rule, providing that "a juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Additionally, the Supreme Court has recognized that the Sixth Amendment requires that the prohibition in Rule 606(b)(1) give way where "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 869 (2017).

Here, Chaney does not—and cannot—contend that anything in the juror's email suggests that the jury was influenced by "extraneous" information or an "outside" influence. Nor does Chaney contend that the email concerned a mistake on the verdict form, or that the jury relied on "racial stereotypes or animus" in convicting him. Accordingly, the prohibition of Rule 606(b)(1) applies, and the Court "may not receive a juror's affidavit or evidence of a juror's statement on these matters." Chaney's request to "recall[]" the juror and make a record as to whether the "jury violated their oath" will therefore be denied.

### G. Chaney's Contention that the Indictment Must Be Dismissed Based on Allegedly False Grand Jury Testimony

Chaney also contends that the indictment against him must be dismissed in its entirety, because Bellamy, a cooperating witness who testified to the grand jury, subsequently changed his testimony about Chaney's involvement in an incident for which Chaney was *not* convicted— the attempted Hobbs Act robbery and carjacking at Regent Street. This argument fails for the reasons set out below.

Bellamy testified to the grand jury that Chaney was present on the evening of the Regent Street incident. However, on September 23, 2017, the Government disclosed to Chaney's counsel that Bellamy, "if called as a witness at [the Phase II] trial, . . . [would] not testify that . . . Chaney was present at the night of the attempted robbery and carjacking," but rather would testify, "consistent with his trial testimony in the [Phase I] trial, that Chaney was involved . . . in the planning, preparation, and attempted execution of the robbery on a [previous] night." (Chaney Mot., Doc. No. 1331, at 5; Gov't Resp., Doc. No. 1514, at 32-33.)

Ultimately, the Government elected not to call Bellamy to testify at the Phase II trial, and Chaney was not convicted of any charge in relation to the Regent Street incident. Chaney nevertheless contends that the indictment against him must be dismissed in its entirety because the grand jury "relied on false testimony." (Chaney Mot., Doc. No. 1331, at 5.) This argument is meritless.

A court may not dismiss an indictment based on "the use of perjured testimony before a grand jury" unless the allegedly perjured testimony actually prejudiced the defendant. United States v. Soberon, 929 F.2d 935, 939-940 (3d Cir. 1991); see also United States v. Edwards, No. 17-cr-42, 2018 WL 827553 (M.D. Pa. Feb. 12, 2018) (rejecting the defendant's contention that the indictment must be dismissed because a law enforcement agent made a false statement to the grand

jury where there was no indication that the statement was "intentionally false" rather than "merely a mistake" and, where there was no prejudice because other evidence was presented to the grand jury as to the issue in question).

Here, as in Edwards, there is no indication that Bellamy's testimony to the grand jury was intentionally false. And, like the defendant in Edwards, Chaney cannot show that Bellamy's testimony before the grand jury prejudiced him, even if it was intentionally false. Chaney was not convicted of any charge in relation to the Regent Street incident. And another cooperating witness, Bowens, testified at trial—as Bellamy did before the grand jury—that Chaney did, in fact, participate in the Regent Street attempted robbery and carjacking. While the trial jury did not conclude that Bowens' testimony was sufficient to find Chaney guilty of those charges beyond a reasonable doubt, Bowens' testimony was sufficient in itself to support the indictment. Because Chaney has neither demonstrated that Bellamy's testimony to the grand jury was perjured, nor that he was prejudiced by the testimony even if it was perjured, his motion to dismiss the indictment against him on this basis will be denied.

### H. Chaney's and Ballard's Challenge to the Jury Selection Procedures

Both Chaney and Ballard contend that they are entitled to a new trial because the procedures used in selecting the jury violated their right to an impartial jury drawn from a representative cross section of the community under the Sixth Amendment. They also claim that the selection process violated the procedures set out in the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.* For the reasons discussed below, these arguments do not warrant a new trial.

During a pre-trial conference, held on August 31, 2017, the Phase II Judge set out the procedures for selecting the jury as follows: The pool of 90 potential jurors would be asked initial voir dire questions proposed by the parties and approved and asked by the Court. A potential juror would indicate an affirmative response to these questions by holding up a numbered card. Only those potential jurors who answered affirmatively to at least one, but not more than five, questions would thereafter be asked individual questions by both the Court and counsel. Based on the answers provided in these individual examinations, the Court would entertain challenges for cause, until 39 passable jurors had been examined—a number just large enough to seat 12 jurors and four alternates after the parties exercised a total of 23 peremptory challenges. Thus, the potential jurors in the initial pool who answered affirmatively to *more* than five questions, or did not answer any questions, would not be individually examined, unless such examinations were necessary because the first group had failed to produce 39 potential jurors. No party objected to this process before the start of jury selection.

On September 6, 2017, the Phase II jury selection commenced using this procedure, whereby 90 potential jurors were asked initial voir dire questions. These questions touched on a number of subjects—including whether the potential jurors knew any of the Defendants, attorneys, or witnesses; whether they or their close family members or friends lived in or near, or frequented, the places where the crimes were committed; whether they had ever previously served on a jury; whether they or their close family members or friends had ever had a problem with substance abuse; whether they or their close family members or friends had been "unfairly accused or convicted of a crime;" or whether they "belonged to the National Rifle Association or any other organization which takes a position regarding the legality and registration of firearms and ammunition." (N.T. 9/6/17 at 18:17-31:8.)

After these preliminary questions were asked, but before individual examinations began, Chaney's counsel objected to the selection process on behalf all Defendants. Chaney's counsel explained:

> MR. IBRAHIM: Your honor, the manner in which the Court indicated that we are going to proceed with jury selection, inasmuch as I understand it, and I may be wrong, but as I understand what the Court is proposing to do and is going to do is select the initial jury selection based upon the amount of responses they give.
>
> The defense would object to that. The randomness of the jury selection is for a designed purpose. I would suggest that it was to let folks come in here. They randomly answer these questions. Sometimes their answers are – their hands are raised for any number of reasons. Sometimes, as the Court has instructed them, if you are not sure, raise your hand. And by culling out individuals based on only have answered [sic] the fewest answers removes the randomness aspect of what is required for jury selection.

(N.T. 9/6/17 at 34:8-25.) Chaney's counsel proposed that individual examinations instead proceed "in the order that [the potential jurors] came in." (Id. at 35:5-6.) The Phase II Judge disagreed:

> THE COURT: No, I'm not going to do it that way. It remains random. There is no element of nonrandomness that has been introduced by this. And given no citation to the contrary and the fact that I believe you waived that argument by not raising it in the times that I brought it up in pretrial, we will proceed . . . .

 (Id. at 35:8-17.)

After overruling the objection, the Court began individual voir dire examinations. As noted above, excluded from this process were those who either: (1) answered affirmatively to more than five of the initial voir dire questions; (2) did not affirmatively answer any of the initial questions; or (3) answered affirmatively to initial Question Number 32, which asked potential jurors to indicate if they could not decide the case fairly and impartially. This yielded a group of 47 potential jurors to be individually examined—enough to strike eight for cause and still reach a panel of 39 without conducting individual examinations of the other potential jurors in the original 90-person pool. (N.T. 9/6/17 at 35:14-36:4.) As it turned out, this number was exactly enough: Individual

examinations of these 47 produced exactly 39 potential jurors, and, accordingly, the remaining potential jurors were dismissed. (Id. at 208:9-209:15.)

The following day, after the parties had exercised a number of their peremptory challenges, Chaney's counsel again noted his objection, contending that the procedure had "effectively ruled out a number of African American potential jurors." (N.T. 9/7/17 at 3:22-4:2.) Counsel for both Chaney and Ballard posited, based on their own previous observations,[8] that there had been four African Americans in the initial 90-person pool, of which only one—Potential Juror Number 72—was individually examined. (Id. at 4:3-16.)[9]

Chaney's counsel further pointed out that the Government struck Potential Juror Number 72 using a peremptory challenge. (N.T. 9/7/17 at 3:10-13.) While noting his desire to preserve an objection to the voir dire procedure, Chaney's counsel challenged this peremptory strike under Batson v. Kentucky, 476 U.S. 79 (1986). After hearing argument, the Court sustained the Batson challenge, and Potential Juror Number 72 was installed as an alternate juror. (N.T. 9/7/17 at 25:2-27:11, 31:10-11.)

In their post-verdict motions, Ballard and Chaney both contend that the jury selection process violated their right to a jury drawn from a fairly representative cross section of the community under the Sixth Amendment, as well as the procedures set out in the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq. Ballard seeks a new trial, arguing that the "[a] disproportionate amount of potential jurors" of African-American descent or "mixed race" were excluded, "before they had the opportunity to explain why they answered a certain number of

---

[8] By this time, the potential jurors who had not been individually examined had been excused.

[9] Ballard's counsel later clarified, after consulting her notes, that she had observed that three of the potential jurors in the initial 90-person pool were African American. The Phase II Judge noted that only two African Americans in the 90-person pool had been observed. (N.T. 9/7/17 at 23:19-24:19.)

screening questions in a certain manner." (Ballard Mot., Doc. No. 1306, at 8.) Chaney alternatively requests, in order to make a record in support of his claim, to "inspect and copy the jury lists pertinent to the pool that was randomly selected for jury selection in [his] trial, including the juror lists that were used by the parties during jury selection and ultimately returned to the Court's Deputy Clerk." (Chaney Mot., Doc. No. 1331, at 7.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This provision requires "the selection of a petit jury from a representative cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 528 (1975). However, it does not guarantee a jury "of any particular composition." Id. at 538. Rather, it requires only that "the jury wheels, pools of names, panels, or venires from which juries are drawn . . . not systematically exclude distinctive groups in the community." Id.

"In order to establish a prima-facie violation of the fair-cross-section requirement [a] defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979).

Here, the Government does not dispute that African Americans, or people of "mixed race," are sufficiently distinctive groups for purposes of the first prong of this three-prong test. But the Government does dispute whether Defendants have demonstrated that these groups were underrepresented, or, even assuming that these groups were underrepresented, that it was the result of systematic exclusion.

As to the second prong—underrepresentation—the United States Court of Appeals for the Third Circuit has explained that "this is, at least in part, a mathematical exercise," which requires a defendant to "demonstrate the percentage of the community made up of the group alleged to be underrepresented." United States v. Weaver, 267 F.3d 231, 240 (3d Cir. 2001). In Weaver, for example, the defendant argued that African Americans and Hispanics were consistently underrepresented in the jury pools summoned by the United States District Court for the Western District of Pennsylvania. Id. at 237. To support this claim, the defendant introduced expert testimony that compared the number of African Americans and Hispanics in the adult population of the counties contained in the applicable division of the Western District, with the master jury wheels used in that division over the preceding several years. Id. The district court rejected the claim, concluding that the statistical evidence presented by defendant's expert was "too weak to establish unfair and unreasonable representation." Id. The Third Circuit agreed. Id. at 244.

Here, Ballard and Chaney have offered far less evidence of underrepresentation than that found to be insufficient in Weaver. Regarding persons of "mixed race," Defendants have offered no evidence at all. As to African Americans, Defendants have offered no expert evidence, nor any other evidence apart from their counsel's personal observations. Defendants' counsel observed that the number of African Americans included in the initial pool of 90 potential jurors was either three or four (thus, constituting approximately 3.3% or 4.4% of the 90-person pool), and that only one was included in the group of 47 potential jurors who were subjected to individual voir dire examinations (thus, constituting approximately 2.1% of this 47-person group). But Defendants have put forward no evidence regarding what percentage of qualified jurors in this district are African American, to which the former figures can be compared. Thus, Defendants have not met

their burden of demonstrating that African Americans or people of mixed race were underrepresented in the pool from which the jurors were drawn.

Even assuming that African Americans or people of "mixed race" were underrepresented, Defendants have not met their burden, under the third prong, of demonstrating that such underrepresentation was attributable to systematic exclusion. While the third prong does not require proof of "intentional discrimination," it does require a showing that underrepresentation is "inherent in the particular jury-selection process utilized," and not merely the result of happenstance. Duren, 439 U.S. at 366.

In Duren, for example, the defendant contended that women were systematically excluded from state court juries as the result of a state law that provided an automatic exemption to jury service for women who requested not to serve. 439 U.S. at 360. The jury selection process at issue in Duren began with the mailing of a questionnaire to a group of people randomly selected from a list of registered voters. Id. at 361. The questionnaire included a paragraph addressed to women, noting that any woman who elected not to serve could so indicate in responding to the questionnaire. Id. Those women who indicated their desire not to serve would not be included on the jury wheel, and thus not later summoned to court for jury service. Id. at 362.

The record in Duren established that women were not underrepresented within the group of individuals mailed the questionnaire—*before* women had an opportunity to exercise the exemption. 439 U.S. at 366. However, women were underrepresented within the group of individuals later summoned to court—*after* women had, and did exercise, the opportunity to opt-out. Id. Accordingly, the United States Supreme Court held that the defendant had sufficiently demonstrated that the underrepresentation of women on jury venires was attributable to the exemption. Id. at 367.

Here, by contrast, Defendants have not demonstrated that any underrepresentation of African Americans or people of "mixed race" can be attributed to the voir dire process employed by the Phase II Judge, nor have Defendants demonstrated that the voir dire questions asked during that process inherently tended to exclude such groups. Thus, Defendants cannot demonstrate that a selection procedure wherein individual examinations began with those who answered affirmatively between one and five of those questions would inherently tend to exclude these groups. Indeed, the questions covered a variety of subjects and were proposed by the parties themselves. Accordingly, Defendants have not made out a prima facie claim for a violation of their Sixth Amendment right to a jury drawn from a representative cross section of the community.

In addition to raising a claim under the Sixth Amendment, Ballard and Chaney contend that the voir dire process violated the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.* (hereinafter "the Act"). The Act "codifies the Sixth Amendment right" for all litigants in federal courts, criminal and civil, providing that such litigants "shall have the right to . . . petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." Id. § 1861. Claims under the Act that a jury was not drawn from a representative cross section of the community are "analyzed using the same standard as a Sixth Amendment fair cross section claim." Weaver, 267 F.3d at 236 (applying the three-prong test from Duren to a claim under both the Sixth Amendment and the Act).

In addition to codifying the requirements of the Sixth Amendment, the Act also sets out certain procedural requirements with which district courts must comply in assembling lists of potential jurors and qualifying them for jury service. Specifically, §§ 1863-1865 require district courts to create a written plan for the random selection of jurors, and outline the requirements for such plans, including the creation of a master jury wheel and the use of a questionnaire to establish

which individuals on that wheel are qualified for jury service. And § 1866 provides for the summoning of qualified jurors. Relevant to Defendants' claims here, § 1866(c) further provides that:

> no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: *Provided*, That any person summoned for jury service may be (1) excused by the court . . . upon a showing of undue hardship or extreme inconvenience, . . . , or (2) excluded by the court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings, or (3) excluded upon peremptory challenge as provided by law, or (4) excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown, or (5) excluded upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

The Third Circuit has held that this list of reasons for excusing or excluding a person from jury service "is exclusive and exhaustive," and "was designed to implement one of the central goals of the Act, the determination of juror qualifications, excuses, exemptions, and exclusions on the basis of objective criteria only." United States v. Calabrese, 942 F.2d 218, 220-221 (3d Cir. 1991). Here, Defendants argue that the voir dire procedure employed by the Phase II Judge violated the requirements of the Act because it "exclu[ded] . . . potential jurors for reasons other than those stated in . . . § 1866(c)." (Ballard Mot., Doc. No. 1306, at 8.) The Government's response does not directly respond to this issue.

Defendants are certainly correct that potential jurors may not be excused or excluded from jury service for any reason other than those specified in the Act. See Calabrese, 942 F.2d at 222 (holding that "a potential juror may be excused or excluded from a panel only on certain enumerated grounds" contained in the Act). In Calabrese, the court concluded that a district court had violated the Act by automatically excusing potential jurors who responded affirmatively to a question on a written questionnaire that asked whether the potential jurors knew any of the defendants. Id. at 222-230. As the court explained, because mere knowledge of the defendants was

not, by itself, enough to strike these potential jurors for cause, it violated the Act to excuse them without a detailed voir dire examination to probe the extent of these potential jurors' relationships with the defendants. Id.

Here, in contrast to the process in Calabrese, the Phase II Judge did not automatically *excuse* or *exclude* potential jurors who answered affirmatively to any specific question. Instead, the court *began* the individual voir dire examinations with those potential jurors who had answered affirmatively between one and five of the general questions—which, again, spanned a variety of subjects. And detailed individual examinations of these potential jurors were allowed. The others in the 90-person pool, who answered affirmatively to more than five questions, or no questions at all, remained in the pool of potential jurors, and could have been examined and included on the jury if needed. Thus, these persons were not, as in Calabrese, excused.

Courts have substantial discretion as to the method of conducting the voir dire process, including the order in which potential jurors are subject to individual voir dire examination. See United States v. Lujan, No. 05-cr-924, 2011 WL 13210273, at *3 (D.N.M. July 12, 2011) (rejecting the defendants' challenge under the Act to a procedure in which the district court conducted individual voir dire examinations "in order of the distance each prospective juror lived from the courthouse," noting the lack of any authority "for the concept that a party has a right to voir dire to proceed in any particular numerical order"); see also United States v. Wecht, 537 F.3d 222, 242-43 (3d Cir. 2008) (noting that "[i]t is well established that the method of conducting the voir dire is left to the sound discretion of the district court"). Thus, while it is true that the process used here made it less likely that potential jurors who answered affirmatively to more than five questions would be seated on the jury, this group was not excluded and the use of this process was within the discretion of the Phase II Judge. The Act does not require "statistical randomness" or

"randomness so rigorous as to forbid any trace of voluntarism"—that is, the ability of jurors to affect the odds that they will be chosen to serve. Lujan, 2011 WL 13210273, at *6-7.

In sum, Defendants have not demonstrated how the jury selection procedures systematically excluded African Americans or people of "mixed race" from the jury, such that they were denied their right under the Sixth Amendment or the Act to a jury drawn from a representative cross section of the community. Nor have Defendants presented a viable claim that the jury selection process violated the Act.[10] Accordingly, Defendants' motions on this basis will be denied.

## IV. STONE'S, JEFFERSON'S, AND DOGGETT'S MOTIONS TO WITHDRAW THEIR GUILTY PLEAS

Before the beginning of the Phase II trial, Defendants Stone, Jefferson, and Doggett entered guilty pleas. The offenses to which these Defendants pled were as follows:

- Stone pled guilty to Count One (conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a)), Count Eighteen (Hobbs Act robbery, for the Lansford Street robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1951(a) and 2), and Count Nineteen (brandishing a firearm in relation to a crime of violence, specifically the Lansford Street robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2).

- Jefferson pled guilty to five counts, including Count One (conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a)), Count Two (Hobbs Act

---

[10] Alternatively, I conclude that Defendants did not properly preserve their claim. The Act sets out certain procedural requirements, providing that a criminal defendant claiming a "substantial failure" to comply with the Act must move for relief "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). Additionally, a defendant's motion must "contain[] a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of [the Act]." Id. § 1867(d). "Courts have uniformly required strict compliance with these procedures." Calabrese, 942 F.2d at 222.

Here, Defendants did not comply with these procedures, as they did not object to the jury selection process until *after* the beginning of voir dire—specifically, after the Court finished asking the general voir dire questions. And more importantly, Defendants did not offer a formal motion supported by a "sworn statement of facts, which if true, would constitute a substantial failure to comply with the provisions of [the Act]." Indeed, Defendants never even cited the Act when discussing their objection, or at any point before raising the Act in post-verdict motions.

robbery, for the Railroad Avenue robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1951(a) and 2), and Count Three (brandishing a firearm in relation to a crime of violence, specifically the Railroad Avenue robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2).

- Doggett pled guilty to four counts, including Count One (conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a)), Count Fifteen (attempted Hobbs Act robbery for the Leas Way robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1951(a) and 2), and Count Seventeen (brandishing a firearm in relation to a crime of violence, specifically the attempted Hobbs Act robbery at Leas Way, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2).

Stone, Jefferson, and Doggett now seek to withdraw their guilty pleas, alleging that their convictions for brandishing a firearm during a crime of violence under § 924(c) are invalid in light of the Supreme Court's decision in Sessions v. Dimaya, 138 S. Ct. 1204 (2018). For the reasons that follow, this argument fails and these Defendants' motions on this basis will be denied.

In Dimaya, the Supreme Court addressed whether one of two parts of the definition of "crime of violence" set out in 18 U.S.C. § 16—a definition which is substantially identical to that contained in § 924(c)—is unconstitutionally vague.[11] Specifically, § 16 provides that an offense is a crime of violence if it meets either of two definitions:

The term "crime of violence" means--

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. In Dimaya, the Court held that § 16(b)—referred to as the "residual clause"—is unconstitutionally vague, in light of: (1) its requirement that a court assess an "ordinary case" of

---

[11] The definition of crime of violence set out in 18 U.S.C. § 16 was relevant in Dimaya because that definition is incorporated into the Immigration and Naturalization Act's definition of "aggravated felony." See 8 U.S.C. § 1101(a)(43).

the offense at issue, and (2) its "ill-defined . . . threshold" for assessing the risk that physical force would be used in such an ordinary case of the offense. <u>Dimaya</u>, 138 S. Ct. at 1223. But the Court did not call into question the constitutionality of the definition of crime of violence contained in § 16(a)—referred to as the "elements clause."

Like the definition of "crime of violence" set out in § 16, the definition contained in § 924(c)(3) contains both an "elements clause" and a "residual clause":

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and--
>
>> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another [i.e., the elements clause], or
>>
>> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. [i.e., the residual clause]

Thus, even assuming that the reasoning in <u>Dimaya</u> applies equally to § 924(c)(3), only the residual clause is implicated—not the elements clause. Accordingly, Stone's, Jefferson's, and Doggett's convictions under § 924(c) are valid, provided that the offense underlying their convictions constitutes a "crime of violence" under the elements clause.

The offenses underlying Stone's, Jefferson's, and Doggett's guilty pleas are Hobbs Act robberies, under 18 U.S.C. § 1951(a). The Third Circuit has squarely held that a Hobbs Act robbery is a "crime of violence" under the elements clause of § 924(c)(3). <u>United States v. Robinson</u>, 844 F.3d 137, 141 (3d Cir. 2016) ("Because we conclude that [the defendant's] Hobbs Act robbery is a crime of violence under the elements clause, we will not address [his] challenge to the residual clause."). Accordingly, whether or not the reasoning of <u>Dimaya</u> applies to invalidate the residual clause in § 924(c)(3), Defendants' convictions remain valid under the elements clause.

In contending otherwise, Stone, Jefferson, and Doggett rely on cases involving *conspiracy* to commit Hobbs Act robbery—not the substantive crime of Hobbs Act robbery. (See Stone Mot., Doc. No. 1509, at 4 (citing United States v. Eshetu, 898 F.3d 36 (D.C. Cir. 2018); United States v. Meza, No. 11-cr-133, 2018 WL 2048899 (D. Mont. May 2, 2018); United States v. Rossetti, No. 99-cr-10098, 2018 WL 3748161 (D. Mass. Aug. 7, 2018)); Jefferson Mot., Doc. No. 1510, at 2 (citing Meza and Eshetu); Doggett Mot., Doc. No. 1531, at 5 (citing Meza)). These cases address whether a charge for conspiracy to commit Hobbs Act robbery constitutes a "crime of violence." But, as noted above, the offenses underlying Defendants' § 924(c) charges were substantive charges for Hobbs Act robbery. Accordingly, these cases do not undermine the applicability of the Third Circuit's holding in Robinson. Consequently, Defendants' Motions seeking to withdraw their guilty pleas on this basis will be denied.[12]

---

[12] In his motion as to this issue, Doggett further suggests that the Government cannot prove his guilt on the § 924(c) charge on the basis of aiding and abetting liability, because it cannot prove that he had "advance knowledge" that his accomplices at Leas Way would be carrying firearms. See (Doggett Mot., Doc. No. 1531, at 2-3 (citing Rosemond v. United States, 572 U.S. 65 (2014)). To the extent that Doggett is arguing that he should also be permitted to withdraw his guilty plea on this basis, I reject this argument as well.

Doggett does not directly assert in his motion that he lacked advance knowledge that his accomplices would be carrying firearms, such that he is innocent of the charge, nor does he provide any other reason why permitting him to withdraw his guilty plea on this basis at this late date would be fair or just. See United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003) (holding that "a defendant is not entitled to withdraw [a guilty] plea simply at his whim," but "must have a fair and just reason" for doing so, and that a court must consider three factors when reviewing a motion to withdraw a guilty plea: "(1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3) whether the government would be prejudiced by the withdrawal.") Where a defendant fails to meet his burden as to the first of these two factors, as Doggett does here, the Government does not need to show that it would be prejudiced by the withdrawal. United States v. Martinez, 785 F.2d 111, 116 (3d Cir. 1986).

Doggett further contends, in a motion joined by Jefferson, that his conviction should be vacated because the indictment is "defective, in that neither Count One charging [c]onspiracy nor Count Fifteen charging [r]obbery have the words intentional or willful in their narrative and therefore, fail to fully inform [him] of the requisite elements to complete the crimes." (Doggett Supp. Mot., Doc. No. 1532, at 4; see also Doggett Pro Se Mot. to Dismiss Indictment, Doc. No. 1543, at 2; Jefferson Mot., Doc. No. 1573, at 1.) However, by pleading guilty, Doggett and Jefferson waived their ability to challenge the indictment as defective. See United States v. Cotton, 535 U.S. 625, 630 (2002) (holding that a defective indictment does not deprive a court of jurisdiction); Washington v. Sobina, 475 F.3d 162, 165 (3d Cir. 2007) ("It is well established that

## V. __MOTIONS FOR RELIEF BASED ON CONTACTS BETWEEN A LAW CLERK AND A GOVERNMENT AGENT__

Finally, all six Defendants seek relief based on social contacts between a law clerk employed by the Phase II Judge and the lead ATF agent. The three Defendants who were convicted during the Phase II trial—Ballard, Chaney, and Segers—seek a new trial on the basis of these contacts. The three Defendants who pled guilty before that trial, Jefferson, Doggett, and Stone, seek to withdraw their guilty pleas for the same reason.

Defendants filed these motions after the contacts at issue were disclosed during a hearing I presided over on May 21, 2018. Two days later, on May 23, 2018, the Chief Judge of this Court issued an order that effectively recused the Phase II Judge from this case, reassigning to me the pending post-verdict motions filed by Ballard and Chaney.

Thereafter, on June 15, 2018, the Chief Judge of this Circuit, the Honorable D. Brooks Smith, appointed the Honorable Jerome B. Simandle of the United States District Court for the District of New Jersey to make factual findings regarding the law clerk/agent contacts. Judge Smith's Order also specified that, after a factual record had been developed, I should decide the legal issues raised herein by the Phase II Defendants.

On July 27, 2018, after conducting a hearing in which the law clerk testified and text messages between the law clerk and the ATF agent were accepted into evidence, Judge Simandle issued Findings of Fact. I must now determine, based on Judge Simandle's factual findings, whether the relief sought in Defendants' motions should be granted. For the reasons that follow, I conclude that no relief is warranted.

---

a criminal defendant's unconditional, knowing and voluntary plea of guilty waives all non-jurisdictional issues.").

### A. *Judge Simandle's Findings of Fact*

Judge Simandle's Findings of Fact set out in detail the contacts at issue. Because the nature and timing of these contacts are critical to my analysis, I recount them here.

The law clerk began his clerkship with the Phase II Judge on September 5, 2017—one day before the start of the Phase II trial, and on the same day that Defendants Jefferson and Doggett entered guilty pleas. Stone entered his guilty plea almost two months earlier, on July 12, 2017. The same law clerk assisted the Phase II Judge throughout the six-week Phase II trial. (J. Simandle Findings of Fact ¶ 2.)

The ATF agent in question was the lead case agent for the entire investigation and also testified on behalf of the Government during both the Phase I and Phase II trials. Before the law clerk began his clerkship, he had met the agent on only one previous occasion, approximately four years earlier, in 2013. On that occasion, the law clerk and the agent met at a bar, through a mutual friend, M. That meeting lasted less than 30 minutes. (J. Simandle Findings of Fact ¶¶ 1-2.)

On September 12, 2017, less than a week into the Phase II trial and at the conclusion of a plea hearing for a Defendant not at issue here, the ATF agent approached the law clerk, reintroduced himself, and reminded the law clerk of their mutual friend and that they had met in 2013. The law clerk responded that he vaguely remembered the agent and the 2013 meeting. This conversation lasted less than a minute and did not include any discussion of Defendants or the Phase II trial. Shortly afterwards, the law clerk informed the Phase II Judge about this interaction. (J. Simandle Findings of Fact ¶ 4.)

On October 8, 2017, later into the Phase II trial, the law clerk and the agent ran into each other at a party held at the house of a mutual neighbor. Neither knew ahead of time that the other would be attending. The two engaged in a brief conversation that lasted one or two minutes. No

details of the trial were discussed, and the clerk told the agent during the encounter that they could not discuss the trial. As with the previous encounter, the law clerk informed the Phase II Judge about the conversation. (J. Simandle Findings of Fact ¶ 5.)

The Phase II trial commenced on September 6, 2017, and concluded on October 18, 2017. In the months that followed, the law clerk and the agent occasionally saw each other on the street in the neighborhood in which they both lived. They exchanged waves or head nods, but did not speak. (J. Simandle Findings of Fact ¶ 6.)

On April 2, 2018, the law clerk ran into the agent on the street near the agent's home. During the conversation that followed, the agent informed the law clerk that he had been promoted, that the Phase II trial would be his last, and that he would be moving out of the neighborhood. The two then exchanged cell phone numbers and mutually agreed to meet for drinks along with their mutual friend, M. The law clerk advised the Phase II Judge of this encounter. (J. Simandle Findings of Fact ¶ 7.)

Three days later, on April 5, 2018, Ballard filed his post-verdict motion. Despite the fact that this motion was pending before the Phase II Judge, the law clerk and the agent arranged, by text messages sent on April 4 and April 10, 2018, to meet for drinks with M at a restaurant/bar.[13] That meeting occurred on the evening of April 11, 2018, and lasted approximately an hour and a half. Early in the meeting, the agent, the law clerk, and M briefly discussed the Phase II trial. Judge Simandle summarized this conversation as follows:

> M asked [the law clerk] and [the agent] what the trial was about, and [the agent] told M that it was a "Hobbs Act robbery case." [The agent] then expressed to [the

---

[13] In his testimony at the evidentiary hearing before Judge Simandle, the law clerk explained that "he (mistakenly) believed that the Phase II Trial was officially over" on April 3, 2018, after Defendant Robinson pled guilty. (Before this plea, the Government had elected to retry Robinson after the jury deadlocked on the charges against him.) (J. Simandle Findings of Fact ¶ 8.) While the trial had concluded, this belief was incorrect because the Phase II Judge had yet to rule on post-verdict motions, to which the law clerk was still assigned.

law clerk] his negative opinion about the closing statement of Ballard's attorney . . . , to which [the law clerk] responded with his own views, mostly positive. Within a minute of [the agent's] initiation of that topic, [the law clerk] told [the agent] that they could not discuss the case any further and, until the end of the evening, no further details of the case were discussed. During the drinks, [the law clerk, the agent,] and M discussed going "axe throwing" the following weekend. Towards the end of the drinks, [the agent] again brought up the Phase II Trial, this time telling [the law clerk] that [one of the] Assistant United States Attorney[s on this case] was "angry" about [Ballard's attorney's] closing statement. [The law clerk] testified that [the agent] also informed [him] that a juror had called [the same Assistant United States Attorney] sometime after the trial to tell [him] that the juror thought he had done a good job at trial. At this point, [the law clerk] told [the agent] that they could not discuss the case any further, but could, perhaps, talk about the case in 20 or 30 years. [The agent] expressed no derogatory remarks about the [D]efendants. There was no further conversation about the trial. . . . [The law clerk, the agent,] and M split the bill.

(J. Simandle Findings of Fact ¶¶ 8-10.)

The law clerk informed the Phase II Judge about this meeting the day after it occurred, advising that the agent had criticized Ballard's counsel's closing statement, but did not mention the post-trial call from the juror to the Assistant U.S. Attorney. (J. Simandle Findings of Fact ¶ 11.)

About a week later, on April 18, 2018, the law clerk again ran into the agent near his house, where they discussed possible plans to meet that weekend. During this meeting, the agent asked the law clerk if he had heard that a witness who testified at the Phase I trial had been murdered two days earlier. The law clerk asked who the witness was, and, after informing him, the agent noted that "none of our guys [i.e., the Phase II Defendants] did it." The agent provided no other details to the law clerk about the murder. Two days later, on April 20, 2018, the agent informed the law clerk that he would not be able to follow through with the plans they had made. (J. Simandle Findings of Fact ¶¶ 12-13.)

Four days later, on April 24, 2018, and while Ballard's post-verdict motion was still pending, Chaney filed a post-verdict motion. Soon thereafter, on either April 27 or April 30, the law clerk informed the Phase II Judge of his April 18, 2018, conversation with the agent, in which he learned of the Phase I witness's murder. The law clerk was then taken off of the case and had no further conversations with the agent. (J. Simandle Findings of Fact ¶¶ 13-15.)

Judge Simandle found the above facts after considering the law clerk's testimony, and reviewing text messages between the law clerk and the agent that were produced by the law clerk's attorney. Judge Simandle noted that the law clerk testified that "he never attempted to influence [the Phase II Judge]'s decision-making process in any way based on his interactions with [the agent]," and further concluded that there was "no evidence that [the law clerk] ever shared information about [the Phase II Judge]'s decision-making processes with the agent, nor [was] there evidence that [the law clerk] disclosed to [the agent] any information that [the law clerk] learned as a law clerk." (J. Simandle Findings of Fact ¶¶ 16-17.)

### B. Legal Discussion

After these findings were issued, I requested that the Defendants inform me whether they continued to seek relief regarding the law clerk/agent issue. All six Defendants responded affirmatively. Of these six Defendants, only Ballard suggests what legal framework governs whether relief is appropriate. Ballard contends that the law clerk's contacts with the agent constitute "structural error," which is not subject to a harmless error analysis. Thus, Ballard argues, I must vacate his conviction, regardless of whether he was prejudiced by the contacts at issue.

The Government responds that this issue is governed by the federal recusal statute, 28 U.S.C. § 455, and that even if a violation of that statute occurred, such violation would not amount to structural error. Accordingly, the Government maintains that because the contacts caused

Defendants no prejudice, no relief is appropriate. For the reasons set out below, I conclude that the contacts at issue do not constitute structural error, and that, in light of the lack of prejudice caused by the contacts, no relief is warranted.

While not explicitly cited or discussed by Defendants, two sources of legal authority merit discussion: the Due Process Clause as it relates to recusal, and the federal recusal statute, 28 U.S.C. § 455. These authorities prescribe when a judge must recuse from a case, and set forth the remedy for failing to do so when required.

1. Due Process Clause

The Due Process Clause "guarantees an absence of actual bias on the part of the judge," and requires recusal where there is "an impermissible risk of actual bias." Williams v. Pennsylvania, 136 S. Ct. 1899, 1905 (2016). However, such risk of actual bias exists in only a limited set of circumstances, such as where the judge has previously been involved in the case as counsel, or where the judge has a direct pecuniary interest in the outcome. See id. (holding that due process required a state supreme court justice to recuse himself from a criminal case in which he was personally involved as a prosecutor); Tumey v. Ohio, 273 U.S. 510, 535 (1927) (holding that due process was violated where, under state law, the presiding judge would collect a fee for his services only if he found a defendant guilty). Courts have found such violations of due process to be structural errors, for which harmless error analysis is inapplicable. Williams, 136 S. Ct. at 1909. Thus, where a judge's failure to recuse violates due process, vacatur of the judge's orders in the case is required notwithstanding a lack of identifiable prejudice caused by the failure to recuse.

Here, while the contacts at issue were certainly ill-advised and showed a serious lapse in judgment by the law clerk and an experienced federal agent, such contacts did not rise to the level of creating bias, on either the part of the law clerk or the Phase II Judge. As Judge Simandle noted,

the law clerk never attempted to influence the Court's decision-making process, and there is no evidence that the law clerk ever shared information about the Court's decision-making process with the agent. As such, no relief is warranted under the Due Process Clause.

## 2. Federal Recusal Statute

The federal recusal statute, 28 U.S.C. § 455, imposes a broader duty to recuse than the Due Process Clause. Specifically, § 455(a) provides that a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Thus, "[u]nder § 455(a), if a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality under the applicable standard, then the judge must recuse." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 343 (3d Cir. 1998). In not requiring actual bias, or an impermissibly high risk of actual bias, Congress was "tuned to the concerns of people who have not served on the bench and who are often all too willing to indulge suspicions and doubts concerning the integrity of judges." In re Sch. Asbestos Litig., 977 F.2d 764, 782 (3d Cir. 1992) (internal quotation marks omitted).

"Even if the judge has no reason to recuse . . . based upon [his] own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned." Mathis v. Huff & Puff Trucking, Inc., 787 F.3d 1297, 1310-1311 (10th Cir. 2015) (quoting Hamid v. Price Waterhouse, 51 F.3d 1411, 1416 (9th Cir. 1995)). Accordingly, while a law clerk's prompt recusal from a case to which he has been assigned may obviate the need for the judge to recuse, "[i]f [the] law clerk continues to work on the case in which his . . . impartiality might reasonably be questioned, . . . the clerk's actual or

potential conflict may be imputed to the judge." Mathis, 787 F.3d at 1311 (citing Hall v. Small Bus. Admin., 695 F.2d 175, 180 (5th Cir. 1983)).[14]

Where recusal is required under § 455(a), a judge has a duty to recuse *sua sponte*. Alexander v. Primaerica Holdings, 10 F.3d 155, 162 (3d Cir. 1993). However, unlike a failure to recuse that violates the Due Process Clause, a judge's failure to recuse in violation of § 455(a) does not constitute a structural error, for which no harmless error analysis is required. Rather, as the Supreme Court has held, "there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance" under § 455(a). Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 862 (1988). Accordingly, in determining whether a judge's failure to recuse under § 455(a) requires vacatur of a final judgment—including a criminal conviction—three factors must be considered: (1) "the risk of injustice to the parties in the particular case;" (2) "the risk that the denial of relief will produce injustice in other cases;" and (3) "the risk of undermining the public's confidence in the judicial process." Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 171 (3d Cir. 2004) (quoting Liljeberg, 486 U.S. at 864).

Here, it is initially important to emphasize that the Phase II Judge was effectively recused from the case on May 23, 2018, when the Chief Judge of this Court reassigned Ballard's and Chaney's post-verdict motions to me. Thereafter, the Phase II Judge took no action in this case. With this recusal date in mind, and applying the guidance regarding § 455(a) set out above, I must determine: (1) whether the contacts between the law clerk and the agent required the Phase II Judge to recuse at any point *before* May 23, 2018; (2) if recusal was required before May 23, 2018, at

---

[14] For this reason, the Federal Judicial Center advises law clerks to bring to their judge's attention as soon as possible potential conflicts of interest, including social relationships with attorneys or litigants in a case before the judge, so that it can be promptly determined whether the law clerk should be precluded from working on the case. See Federal Judicial Center, Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks 11-12 (4th ed. 2013).

what point should that recusal have occurred; and (3) what remedy is required for any orders entered, or other actions taken, by the Phase II Judge *after* recusal should have occurred.

For the reasons explained below, I conclude that, given the chronology of the interactions between the clerk and the agent, if the Phase II Judge was required to recuse at any point, that point was reached only in April 2018, when the law clerk/agent contacts became more substantive. These particular contacts all occurred *after* the jury rendered its verdict as to Ballard, Chaney, and Segers; *after* Jefferson, Doggett, and Stone entered their guilty pleas; and *after* the Phase II Judge denied Stone's subsequent *pro se* motion to withdraw his guilty plea. In fact, the only matters left for the Phase II Judge to resolve during April 2018 were the two post-verdict motions filed by Ballard and Chaney. Because the Phase II Judge took no significant action with regard to these six Defendants after April 2018, and because recusal occurred in May 2018, leaving the remaining post-trial matters to me, no relief is warranted. Several factors support this conclusion.

First, if the contacts between the law clerk and the agent required the Phase II Judge's recusal at any point, that point was only reached in April 2018, when the magnitude of the contacts significantly increased. A social or other extrajudicial relationship between a judge, or the judge's law clerk, and a party or witness in a case can, at some point, become so significant that a reasonable person would question the judge's ability to remain impartial. See, e.g., In re Apollo, 535 F. App'x 169, 172-175 (3d Cir. 2013) (holding that a trial judge was required to recuse where the judge sat on a board of directors of a community organization along with the plaintiff in the case, as well as several witnesses in the case, and noting that the judge's service brought the judge into "regular contact" with these individuals). However, because judges and law clerks are often active members of their communities, mere "tangential connections to the individuals and entities involved in a particular case are not uncommon," and for that reason do not require recusal. Id.

For example, courts have held that mere acquaintanceship between a judge and a party or a witness does not require recusal. See, e.g., Parrish v. Bd. of Comm'rs of Ala. State Bar, 524 F.2d 98, 104 (5th Cir. 1974) (holding that recusal was not required where the judge's acquaintanceship with a number of witnesses and defense counsel in the case "d[id] not exceed what might be expected as background or associational activities with respect to the usual district judge").

The timing, as well as the magnitude, of the relationship is important: a relationship that withered away long ago is less likely to raise reasonable doubts about the judge's or law clerk's impartiality than one that is ongoing. Compare Martin v. Monumental Life Ins. Co., 240 F.3d 223, 235-237 (3d Cir. 2001) (holding that recusal was not required where the judge had been, six years earlier, a partner at a law firm that represented a party in the case), with In re Apollo, 535 F. App'x at 172-75 (holding that recusal was appropriate where the trial judge, at the time of the litigation, sat on a board of directors with individuals involved in the matter, bringing the judge into "regular contact" with those individuals).

When the teachings of these cases are applied to the contacts between the law clerk and the agent here, it becomes clear that the relationship between the two that existed *before* April 2018 did not require recusal, either of the law clerk or the Phase II Judge. That relationship can, at most, be described as an acquaintanceship, as it consisted only of:

- A single meeting through a mutual friend, lasting no more than 30 minutes, four years before the trial, which the law clerk only vaguely remembered by the time of trial;

- A brief re-introduction after a hearing during the trial, lasting less than a minute; and

- An unplanned encounter at a party, in which the two had a conversation that lasted one or two minutes.

Moreover, the two did not discuss anything about the case during these brief encounters before April 2018. A reasonable person, with knowledge of these facts, would not harbor doubts about either the law clerk's or the Phase II Judge's impartiality at any point prior to April 2018.

The contacts between the law clerk and the agent during April 2018 are more problematic. During that month—days after Ballard filed his post-verdict motion with the Phase II Judge and days before Chaney filed his post-verdict motion, both of which motions were assigned to the law clerk—the clerk and the agent arranged to meet, and did in fact meet, for drinks at a restaurant/bar. During that meeting and afterwards, they made plans to engage in another social outing (although the outing ultimately did not occur). And in contrast to the pre-April 2018 contacts, the law clerk and the agent *did* discuss matters related to the case: Ballard's counsel's closing statement and a juror's contact with one of the Assistant U.S. Attorneys on the case.

A reasonable person, with knowledge of all of the above facts, could certainly harbor doubts about the law clerk's impartiality at that time. And if those contacts were sufficient to warrant the law clerk's recusal, they could be sufficient to warrant the Phase II Judge's recusal, as the law clerk was not promptly removed from the case following these contacts.

But even if the April 2018 contacts warranted recusal, no relief is appropriate, because the Phase II Judge had taken no significant action during that time period. Defendants Ballard, Chaney, and Segers were convicted at the conclusion of the Phase II trial, on October 18, 2017, more than five months before these contacts. And while Ballard and Chaney filed the instant post-verdict motions in April 2018, those motions were reassigned to me and have been decided without any input from or contact by the law clerk or the Phase II Judge.

As to Jefferson, Doggett, and Stone, all three of these Defendants pled guilty before the Phase II trial began in September 2017. Thereafter, all three moved to withdraw their guilty pleas. However, two of those motions—Jefferson's and Doggett's—were decided by me. Stone's motion was denied by the Phase II Judge on November 17, 2017, more than four months before the April 2018 contacts.

Conduct that requires a judge to recuse going forward, may also require vacatur of the judge's previous orders, where that conduct reasonably calls into question the judge's impartiality at the time of those previous orders. See United States v. Antar, 53 F.3d 568, 576 (3d Cir. 1995). In Antar, for example, a district court judge, who presided over both a criminal case for securities fraud and a concurrent civil action against the defendants brought by the Securities and Exchange Commission, commented at the sentencing of one of the defendants that the judge's "object in th[e] case from day one ha[d] always been to get back to the public that which was taken from it as a result of the fraudulent activities of th[at] defendant and others." Id. at 576. The Third Circuit concluded that this comment required vacatur not only of the sentence, but also of the jury's guilty verdict, because the comment would give "[a] reasonable observer . . . serious reason to question whether prior rulings in the case were based on impartial considerations or the judge's stated goal." Id. The court further explained that it did not matter that "the judge's motivation came to light only after the conclusion of the trial," or that the "judge's rulings . . . may have been otherwise defensible, [because] we are concerned with the appearance of partiality." Id.

Here, by contrast to the statement at issue in Antar, the April 2018 contacts between the law clerk and the agent do not reasonably call into question the clerk's or the Phase II Judge's impartiality at an earlier point in time. Rather, those contacts reasonably suggest no more than that

in April 2018, the law clerk sought to cultivate a friendship with the agent and imprudently did so while the matter was still pending before his judge.

Finally, even if the April 2018 contacts *did* reasonably cast doubt on previous decisions by the Phase II Judge, a new trial would not be the required remedy. As noted above, in considering an appropriate remedy, a court considers: (1) "the risk of injustice to the parties in the particular case;" (2) "the risk that the denial of relief will produce injustice in other cases;" and (3) "the risk of undermining the public's confidence in the judicial process." Liljeberg, 486 U.S. at 864.

By all accounts, the Phase II Judge accorded all parties involved a fair trial and the pleas were entered voluntarily. Denying Defendants' motions to vacate their convictions poses little if any risk of injustice to them, because these Defendants have had an opportunity to seek review of the Phase II Judge's decisions at trial by filing post-verdict motions—as Ballard and Chaney have done. These motions have been decided without any input from the Phase II law clerk, and Defendants will be able to seek further review of those decisions (assuming that they were properly preserved at trial) before the Court of Appeals. Cf. Selkridge, 360 F.3d at 171 (noting that while recusal was warranted, vacatur of the court's order granting summary judgment was not required because, among other things, the decision would be subject to plenary review by the Court of Appeals).

Finally, denying Defendants' motions does not risk injustice to any other parties, or undermine public confidence in the judicial process. Indeed, any harm to public confidence in the integrity of the judicial process has been fully remedied by the full disclosure of the law clerk/agent contacts and the thorough factfinding process conducted by Judge Simandle, in which Defendants participated.

## VI.  <u>**CONCLUSION**</u>

For all of the reasons discussed above, I will deny Defendants' pending Motions. An appropriate Order follows.